Below is an Opinion of the Court.

*Trish M Brown*

TRISH M. BROWN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | Case No. 08-37225-tmb11 |
| | ) | |
| JON M. HARDER, | ) | |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| JON M. HARDER, | ) | Adv. Pro No. 08-3265-tmb |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | (Motion for Preliminary Injunction) |
| PREMIERWEST BANK, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

On December 31, 2008, Debtor, Jon M. Harder ("Mr. Harder"), as plaintiff, filed this action and motion for preliminary injunction against 99 secured lenders as defendants ("Motion"), which came on for an evidentiary hearing ("Hearing") on January 26, 27, and 28, 2009. Many of the secured lenders settled with Mr. Harder, either before or during the Hearing. Because the dismissals related to those defendants have not all been filed, it is unclear how many secured lenders remain as defendants at the time of this ruling.

Prior to the Hearing, I allowed 12 affiliates of Sunwest Management, Inc. ("Sunwest"), to

Page 1 - MEMORANDUM OPINION

intervene ("Affiliate Intervenors"). I also allowed 41 Tenants-in-Common Investors to intervene ("TIC Intervenors").

Mr. Harder was represented by Stephen F. English. The Affiliate Intervenors were represented by Albert N. Kennedy. The TIC Intervenors were represented by Gary K. Kahn. Richard J. Stone represented several of the secured lender defendants; other secured lender defendants were represented as noted in the record at the Hearing.

Through his Motion, Mr. Harder requests that I issue an order enjoining the defendants, all of whom are alleged to be secured lenders holding security interests in one or more of approximately 250 senior living facilities, from taking any action to enforce their security interests. The Motion also requests that the defendants be enjoined from taking any action to enforce guarantees of the secured debt which were executed by Mr. Harder and other individuals in the process of obtaining the loan.

Following the Hearing, I reviewed my notes, the exhibits, and the pleadings and other submissions in the file. I also read applicable legal authorities, both as cited to me and as located through my own research. I have considered carefully the oral arguments presented and have read counsels' submissions in detail. The following findings of fact and legal conclusions constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable in this adversary proceeding under Federal Rules of Bankruptcy Procedure 9014 and 7052.[1] To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are adopted as such.

For the reasons I now set forth, I deny the Motion.

BACKGROUND

Prior to the commencement of his chapter 11 bankruptcy case, Mr. Harder owned interests in hundreds of limited liability companies ("LLCs"), most of which were formed under the laws of the State of Oregon. These LLCs in turn owned and/or operated more than 250 senior assisted living facilities ("ALFs") nationwide. The ALFs are referred to in the complaint as "Vulnerable Facilities." In addition to his interests

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. § 101-1532, and to the Federal Rules of Bankruptcy Procedure ("FRBP"), Rules 1001-9037.

Page 2 - MEMORANDUM OPINION

in the ALFs, Mr. Harder was the 75 percent shareholder of Sunwest, which managed the ALFs. Mr. Harder also owned majority equity interests in the following entities: Senenet, Inc., which employs nearly all Sunwest personnel and the employees who work at the ALFs; Canyon Creek Development ("CCD"), which buys and develops land for senior housing projects; Canyon Creek Financial ("CCF"), a broker-dealer which sells securities offerings in certain LLCs; and KDA, a construction company, which mainly builds senior housing. Finally, Mr. Harder had an interest in a number of affiliated entities ("AEs"), many of which own bare land for the development of a new facility or the expansion of an existing facility.

Affiliate Intervenors' Exhibit 4 summarizes Mr. Harder's interest in each of 285 ALFs, ranging from a low of 5.26 percent to a high of 100 percent. Affiliate Intervenors' Exhibit 5 summarizes Mr. Harder's interest in each of the 299 AEs, ranging from a low of 0 percent to a high of 100 percent. It was unclear from the testimony if all of these entities are currently operating as there were 197 entities listed in Sunwest's Consolidated Portfolio Detail dated November 30, 2008.

Formation and Initial Funding of ALFs

The LLCs were formed as single purpose entities ("SPEs"), each for the purpose of owning, operating, or owning and operating, a specific ALF. In some cases, an ALF was owned by one SPE ("Owner SPE"), which would lease that facility to another SPE formed for the purpose of operating that facility ("Operator SPE"). The Operator SPE would then enter a management agreement with Sunwest.

To acquire or develop a facility, the Owner SPE, as borrower, would receive a large loan made by one of the defendants. The loans would be secured by the real property, the building and its furnishings and the personal property of the Owner SPE , including an assignment of rents.[2] Some of the ALFs are in pools of loans by one lender, which have been cross-collateralized and have cross-default provisions. For example, Column Financial, Inc. ("Column Financial") has collateral involving 20 ALFs. Although Column Financial's debt is approximately $159 million, this debt was shown as split among the various ALFs that are indebted to Column Financial.

---

[2] In addition to these secured debts, there is another $300 million in debt secured by non-senior housing properties.

Page 3 - MEMORANDUM OPINION

The evidence presented reflected loans ranging from approximately $1,322,432 to approximately $21,000,000, all before accrued interest, late charges, and other loan accruals. Almost all of these loans have been guaranteed by Mr. Harder, his wife, Kristin Harder, Darryl Fisher ("Mr. Fisher"), and his wife, Carol Fisher, and other employees of Sunwest. All of the guarantors except Mr. Harder will be referred to collectively as "Other Guarantors".

In addition to the loans taken by SPEs, Mr. Harder borrowed funds in his own name from which he in turn made unsecured loans to the ALFs as the need arose. Mr. Harder and Mr. Fisher borrowed or guaranteed another $76 million from 274 creditors; these funds went into the operation of the ALFs and are unsecured.

CCF raised money from private investors by selling these investors "tenant in common" interests ("TICs") in specific SPE Owners. These investors will hereinafter be referred to as TIC Investors. The funds from the TICs were apparently used to acquire, improve or operate the facilities owned by the Owner SPEs in which the TICs invested. The security interest of the lender was granted with the consent of, and superior to the interests of, the TICs.

More than 1,800 TICs and 250 LLC investors have put an estimated $436 million into the various individual ALFs. At the time of the Hearing, lawyers representing 929 TIC Investors either testified or made offers of proof with respect to cash investments in the LLCs of over $198 million and assumed debt of over $125 million. The testimony involving the TIC Investors was necessarily in generalities. However, the uncontroverted testimony was that the TIC Investors have fractional interests in the Owner SPEs, and that those interests are subordinate to the debt of the secured lenders. Many of the TIC investments were the result of 1031 exchanges under the Internal Revenue Code. At least one half of the TIC Investors are retirees. The TIC Investors are at risk not only of losing their entire investments if the secured lenders foreclose, but they may have negative tax consequences as well. Although the TIC Investors assert that they have claims against Mr. Harder and others including claims for breach of contract, breach of fiduciary duty, and securities law violations, it does not appear that the TIC Investors can be made whole if they prevail on those claims. Therefore, the TIC Investors support Mr. Harder's request for the injunction, in the hopes that

Page 4 - MEMORANDUM OPINION

1  something can be worked out with the various secured lenders so that an orderly liquidation will result in a

2  payout of all or a portion of their investments.

3  <u>Management and Cash Flow of ALFs</u>

4  As the facility manager of the ALFs, Sunwest was to collect the monthly rents from residents,

5  pay the operational expenses of the facility from which the rents were collected, deduct its management fee

6  for the management of the specific facility, and turn over any surplus rents to the Operator SPE or, if there

7  was no Operator SPE, to the Owner SPE for the specific facility. From funds it received from Sunwest, the

8  Operator SPE would pay the Owner SPE for the specific facility the rent due under the lease, including rent

9  payments to any of the TIC Investors who had invested in the specific facility. From the lease payments, the

10  Owner SPE would make its monthly debt service due to its secured lender.

11  At the time many of the ALFs were acquired by their respective SPEs, they were either in the

12  early stages of development or in poor financial shape. Until these ALFs reached full occupancy, they

13  needed additional cash from which to pay expenses. Through his control of Sunwest, Mr. Harder treated the

14  ALFs as a single consolidated entity, with central management, personnel administration, marketing

15  services, and cash management. Sunwest provided this additional cash by "borrowing" from successful

16  ALFs and "loaning" the funds to less successful facilities. Once a struggling facility improved, it either

17  began making payments on the "loan" from the more successful facility or it was refinanced or sold to

18  generate funds. To the extent profits were generated from the sale of a facility, Mr. Harder typically used the

19  funds distributed to him, either as loans to other ALFs, or to invest in new facilities.

20  Early in 2008, many of the facilities began to have cash flow problems. The national decline

21  in home prices contributed to the declining occupancy rates and corresponding revenue to the ALFs, because

22  seniors who otherwise would have sold their homes and used the proceeds to move into a facility stayed in

23  their homes. The "credit squeeze" further exacerbated the problem; many ALFs were unable to refinance

24  loans and the shortage of available credit prevented Mr. Harder from borrowing to cover cash shortfalls.

25  Additionally, the sale of ALFs had become difficult because potential buyers were unable to raise sufficient

26  funds to complete a purchase.

Page 5 - MEMORANDUM OPINION

As revenues declined, many Owner SPEs were unable to service their secured debt. Ultimately, nearly every Operator SPE was in default on its lease payments to the Owner SPE , and derivatively to the TICs with an interest in the Owner SPE.  Nearly every Owner SPE was in default to its secured lender.  In addition, many ALFs had fallen behind on payments owed to taxing authorities, vendors, and other creditors.  The problem escalated when secured lenders began taking action to enforce their rights under state laws, including enforcement of lock box provisions, appointments of receivers, and in some cases, foreclosure.

In April 2008, Sunwest hired Alvarez and Marsal Healthcare Industry Group, LLC ("A & M") to review the ALFs and all the Sunwest affiliates to see if a workout arrangement might be possible.  As a starting point in a restructuring plan, A & M classified each ALF based upon the level of its financial success as measured by the obligations that facility could meet from its net operating income ("NOI").  The NOI of a "Tier 1" ALF could pay all operating expenses for the facility, Sunwest's management fee, the full debt service to the secured lender, and any rents due to the Owner SPEs and the TICs.  The NOI of a "Tier 2" facility was sufficient to pay all operating expenses for the facility, Sunwest's management fee, the debt service to the secured lender, but not the full amount of the rent due to the Operator SPEs and the TICs.  The NOI of a "Tier 3" facility was sufficient to pay all operating expenses, but not to meet any other obligations connected to the facility.  Finally, the NOI of a "Tier 4" facility was not sufficient even to meet monthly operating expenses.

In the fall of 2008, Mr. Harder and other Sunwest insiders met with Clyde Hamstreet ("Mr. Hamstreet"), a workout specialist.  Thereafter, in an attempt to salvage their business affairs, Mr. Harder and two other Sunwest insiders, Mr. Fisher and Wallace Gutzler ("Mr. Gutzler") entered into a restructuring agreement with Clyde A. Hamstreet & Associates, LLC,  on or about November 20, 2008.  The CRO Agreement was amended and restated on December 30, 2008, and is referred to as the "CRO Agreement." Under the CRO Agreement, Mr. Hamstreet was appointed the chief restructuring officer ("CRO") of all LLCs referred to in the CRO Agreement.  To effectuate the CRO Agreement, Messrs. Harder, Fisher and Gutzler turned over to the CRO control of the LCCs, and each assigned to the CRO his respective economic

Page 6 - MEMORANDUM OPINION

interests in Sunwest and the named LLCs.  Under the CRO Agreement, the CRO is to use these interests to achieve a global restructuring.  According to the declaration of Mr. Hamstreet in support of the Motion, it was hoped that Mr. Hamstreet would report to an independent board, which was  to be constituted by January 15, 2009.  The board was to have no prior material ties to Sunwest.  However, at the time of Hearing, Mr. Hamstreet, a well respected turnaround professional in Oregon, had been unable to find anyone to serve on such an independent board.

After the CRO Agreement was executed, Mr. Hamstreet began to negotiate standstill agreements with secured lenders to obtain "breathing room" to complete a negotiated $360 million sale of the 45 facilities that GE Healthcare Financial Services ("GE Healthcare") had financed, and to implement the contemplated global restructuring.  It was anticipated that the GE Healthcare sale would generate $45 million in funds which could be used to implement Sunwest's restructuring plan under the CRO Agreement.

However, before the sale could close, certain creditors obtained judgments against Mr. Harder in the aggregate amount of $5 million, and commenced garnishment activities on those judgments, leading Mr. Harder to file his chapter 11 petition on December 31, 2008.

Mr. Harder's Statement of Financial Affairs ("SOFA") includes nine pages of lawsuits listed in answer to question 4.a. with respect to the suits filed against Mr. Harder in the one year preceding the December 31, 2008, filing of his bankruptcy case.  These financial issues are not Mr. Harder's only concerns.  Sunwest, CCF, Mr. Harder and other principals of the businesses have become the subject of securities investigations by the U.S. Securities and Exchange Commission ("SEC") and the Oregon Division of Finance and Corporate Securities.

According to Mr. Hamstreet, the ALFs collectively have a going-concern value of $2 billion, external debt of $1.8 billion, and annual revenue of $500 million making a restructuring feasible.  Mr. Hamstreet testified that from October 2008 to January 2009, 25 receivers had been appointed for the ALFs, 10 receivership hearings were scheduled, nine ALFs had completed foreclosures or forced sales, and 69 ALFs had pending foreclosure actions.  Mr. Hamstreet has initiated 25 chapter 11 cases filed to protect the ALFs, not counting the "Carolina 7" which were sold via a § 363 sale in Tennessee.  However, Mr. Harder

contends that neither he nor Sunwest has the financial resources and personnel to collect information to file a chapter 11 case for each ALF in order to protect its respective facility.   Therefore, on December 31, 2008, Mr. Harder initiated this adversary proceeding and brought this Motion to obtain injunctive relief against the secured lenders which hold secured interests in the ALFs and their real property.  Specifically, Mr. Harder seeks a preliminary and permanent injunction against the defendants and any creditors with claims against "Sunwest or its related entities and individuals," from pursuing collection actions, foreclosures or receiverships of the facilities.  In addition, Mr. Harder wants an injunction against the defendants from pursuing any court actions or other collection efforts against the Other Guarantors.

DISCUSSION

A.  <u>Jurisdiction</u>

The Motion requests that I utilize § 105(a) to extend the benefits of the automatic stay under § 362(a) to protect the TIC interests and other subordinated secured lenders.  Section 105(a) provides:

> "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

Whether and when to apply § 105(a) is a matter which arises under title 11 or which arises in a case under title 11, and, therefore, is a matter of core jurisdiction of the bankruptcy court pursuant to 28 U.S.C. § 157(b)(1).

B.  <u>Injunction Standards</u>

The parties are in agreement that the standards for the imposition of a preliminary injunction under § 105(a) are set forth by the Ninth Circuit in <u>Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)</u>, 502 F.3d 1086, 1094-95 (9th Cir. 2007).  Those standards are effectively the same as the standards for the issuance of a preliminary injunction in the non-bankruptcy context.  Specifically, the moving party must demonstrate:

> "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships

Page 8 - MEMORANDUM OPINION

favoring the plaintiff, and (4) advancement of the public interest (in certain cases). Alternatively, a court may grant the injunction if the plaintiff demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.

As we have said many times regarding the two alternative formulations of the preliminary injunction test: These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum." (italics in original)

Id. at 1093, quoting Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005). The only distinction in the bankruptcy context is that the first element, i.e. "a strong likelihood of success on the merits," requires a showing that "the debtor has a reasonable likelihood of a successful reorganization." Id. at 1096. Additionally, I note the admonishment of the Ninth Circuit that these standards are meant to ensure that stays granted under § 105 are not to be granted lightly. Id. at 1095. Bankruptcy courts issue § 105(a) injunctions only in "unusual" circumstances where the failure to issue an injunction will have a "substantial and adverse impact" upon the debtor's continuing existence; indeed, "the burden is on the debtor . . . to establish with persuasive evidence that the extraordinary remedy is warranted." See Gathering Rest., Inc. v. First Nat'l Bank (In re Gathering Rest., Inc.), 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986).

      1.  Does "the debtor" have a reasonable likelihood of a successful reorganization?

I begin with the obvious observation that Mr. Harder is the debtor in this case. I also observe that Sunwest is not the debtor in this case. Sunwest is a separate legal entity of which Mr. Harder was CEO, and in which he was the majority shareholder. I further note that although "the collective management of Sunwest has, in some respects, treated [the ALFs] as a single consolidated entity, with central management, personnel administration, marketing services and cash management," the ALFs are each owned by distinct separate limited liability companies. The ALFs are not Sunwest, and Sunwest is not Mr. Harder. Thus, the proposed reorganization I must evaluate in determining whether the debtor has "a reasonable likelihood of a successful reorganization" is Mr. Harder's.

"The objective of [a chapter 11 proceeding] is to bring all of the debtor's property and all of the claims against the debtor into one proceeding, where the debtor can be maintained as a going concern and the claims can be resolved collectively."

Page 9 - MEMORANDUM OPINION

COLLIER ON BANKRUPTCY ¶ 1100.05, at p. 1100-13 (15th rev. ed. 2008). This process is implemented through confirmation of a plan. That plan, inter alia, must provide adequate means for its implementation, including a disposition of property of the bankruptcy estate, whether by retention of that property by the debtor, or by sales or other transfer of all or any part of that property. See § 1123(a)(5).

Mr. Harder admitted at the Hearing that he did not have a reorganization plan for himself, as distinct from the proposed Sunwest restructuring. Similarly, Mr. Hamstreet testified that the only restructuring he is working on is that of Sunwest and at least some of the Owner SPEs. Victor Marcos testified similarly. I have no evidence before me of any plan for Mr. Harder's reorganization based on which I can determine whether Mr. Harder has a reasonable likelihood of a successful reorganization.

Nevertheless, I will attempt to determine whether a reorganization is possible for Mr. Harder. In doing so, I look first to the assets Mr. Harder has to contribute to that reorganization.

Property of the estate.

As of the date of the Hearing, Mr. Harder had not filed his Schedules A or B, through which he would identify all property in which he claims an interest. For purposes of the Motion, Mr. Harder has conceded that he does not have "significant resources" beyond his ownership interests in Sunwest, the Owner SPEs and Operator SPEs, and the related entities I identified earlier. The Schedules and SOFA were filed on January 30, 2009. Mr. Harder's interest in the personal property of the Sunwest affiliates was listed as having a value of $149,762,931.59. Mr. Harder's account receivables from those same entities totaled $85,712,278.14. The Schedules appear to ignore the CRO Agreement under which Mr. Harder assigned his economic interest in the Sunwest affiliates to the CRO.

As relevant to Mr. Harder's bankruptcy case, § 541(a)(1) provides that:

"(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case."

As previously stated, Mr. Harder asserts that through his ownership interests in the SPEs and Sunwest, assets are available to facilitate the reorganization of his business interests. The objecting parties

Page 10 - MEMORANDUM OPINION

challenge this assertion on two bases.

First, the secured lenders assert that Mr. Harder does not "own" the ALFs because each ALF is owned by a separate legal entity. Although most were limited liability companies, there was testimony that there are a few limited liability partnerships and a few C corporations. The analysis would be the same no matter what the structure of the legal entity might be. The secured lenders contend that, at most, Mr. Harder owns an interest in each of the LLCs which own the facilities. I agree. Pursuant both to general legal principles and Oregon law, Mr. Harder personally does not own any of the facilities themselves.

Fundamental principles of corporate law hold that a corporation and its stockholders or a LCC and its members are separate legal entities, and that the corporation or LLC owns the assets, not the stockholders or members. See, e.g., In re HSM Kennewick, L.P., 347 B.R. 569, 571-72 (Bankr. N.D. Tex. 2006); Sun Towers, Inc. v. Heckler, 725 F.2d 315, 318 (5th Cir. 1984). For the corporations, the property interest of Mr. Harder's bankruptcy estate extends only to the intangible personal property rights represented by the stock certificates. Peoples Bankshares, Ltd. v. Dept. of Banking (In re Peoples Bankshares, Ltd.), 68 B.R. 536, 539 (Bankr. N.D. Iowa 1986).

Each facility is owned by an Owner SPE, which is an LLC. Mr. Harder is a member of most, if not all, of the LLCs. Under Oregon law, a membership interest in a limited liability company is defined as "personal property." O.R.S. § 63.239. This provision explicitly provides that "[a] member is not a coowner of and has no interest in specific limited liability company property." Id. (emphasis added).

Second, the secured lenders assert that, because they have been assigned to the CRO, not even Mr. Harder's interest in the LLCs are part of his bankruptcy estate. Again, I agree. The CRO Agreement provides:

> "Each Equityholder [Harder is so identified] hereby assigns to the CRO, for the benefit of and as agent for the Company [Sunwest and all Affiliates], all of his right, title and interest in and to all cash and noncash proceeds of the shares of stock, limited liability company ownership interests and partnership interests in the Affiliates that are paid or payable from time to time on account of such equity interests, including (without limitation) all dividends and other distributions. This assignment is an unconditional, absolute and present assignment by the Equityholders and is not an assignment in the nature of a pledge or the mere grant of a security interest."

Page 11 - MEMORANDUM OPINION

1    Mr. Harder's assignment of his member interest in the LLCs was authorized by law.  <u>See</u>

2    O.R.S. § 63.249(1).  The assignment gave the CRO the right to receive and retain any distributions or

3    allocations of profits from the LLCs attributable to Mr. Harder's member interests.  O.R.S. § 63.249(3).

4    Thus, there are no funds which could be paid to Mr. Harder's bankruptcy estate based on any member

5    interest he at one time held.

6        Significantly, in exchange for the assignment of his interests in the LLCs and Sunwest, the

7    CRO has agreed to accrue in the form of promissory notes any funds that might have come to Mr. Harder

8    had he not assigned his interests, which will now be used by the CRO in his restructuring of Sunwest and

9    certain SPEs.  Notably, any such promissory notes will not mature for a period of five years.  Furthermore,

10   although not discussed at the Hearing, any payments made pursuant to ¶ 3.3 of the CRO Agreement,

11   including the Monthly Allowance is to be treated as prepayments of the promissory notes and, therefore, the

12   value of those promissory notes is speculative.  Thus, as a practical matter these funds are not available to

13   Mr. Harder's creditors while he is in bankruptcy, but they are either available to fund his ongoing personal

14   expenses or  accruing for his personal benefit for a period when he presumably will have discharged any

15   personal liability he might owe.

16       Aside from issues inherent in the prepetition transfers themselves, it is not economically

17   significant for purposes of deciding whether to grant a preliminary injunction that Mr. Harder no longer

18   holds those interests.  Unless and until the property owned by the LLCs in which Mr. Harder has an

19   ownership interest has been liquidated, his interests in the LLCs cannot generate any funds with which to

20   fund or implement a plan to pay his creditors.  Given that only the Tier 1 properties are meeting operating

21   expenses, debt service, and payments to the TIC Investors, very few facilities represent the potential source

22   of equity available to Mr. Harder on account of his interests in the LLCs.

23       Given that Mr. Harder is unlikely to receive funds by virtue of his interest in the LLCs or

24   Sunwest with which to implement a chapter 11 plan, and where Mr. Harder has conceded these were his

25   significant assets, what other resources might be available?  Section 1115 provides that for individual debtors

26   in cases filed under chapter 11 that

Page 12 - MEMORANDUM OPINION

> ". . . property of the estate includes, in addition to the property specified in
> section 541—
>> . . .(2) earnings from services performed by the debtor after the commencement of the case
>> but before the case is closed . . . ."

Thus, Mr. Harder's salary of approximately $4,000 per month and his "Monthly Allowance" under the CRO Agreement of $54,000 per month would be property of his bankruptcy estate. While the combined income of salary and Monthly Allowance is fairly large by the standards of debtors I usually see in this court, it represents a significant decrease in Mr. Harder's overall multi-million dollar income for recent years based on his most recently filed tax returns. Mr. Harder's Schedule I reports current income in January 2009 between he and his wife of $32,004, which will increase to $61,004 in February 2009. Schedule J reports current expenditures of $46,205, leaving possibly as much as $14,799 per month which could be available for creditors. While this is a sizeable sum, in the context of this case, it is a drop in the bucket as I will discuss.

Mr. Harder's list of twenty largest creditors filed with his petition reflects aggregate unsecured obligations of at least $48 million. The Schedules reveal secured claims of $8,140,594.98, known unsecured claims of $98,239,095.62, and pages and pages of unknown unsecured claims. Thus, the extent of the unsecured claims is not quantifiable at this time. Even with a monthly salary and allowance of $57,500, Mr. Harder has minimal assets available with which to implement any plan he might propose.

Mr. Hamstreet testified that Mr. Harder's bankruptcy estate will receive approximately $3.1 million from the recent sale of the GE Healthcare facilities based upon loans Mr. Harder had made to support the operation of those facilities. However, I was not presented with any documentary evidence to support that testimony from which I could evaluate whether in fact funds should flow to Mr. Harder's bankruptcy estate. In fact, it appeared just the opposite. The Sunwest Plan of Restructuring dated January 2009 ("Restructuring Plan") relies upon Mr. Harder's contribution of all of the funds from his interests assigned to Mr. Hamstreet under the CRO Agreement and the $3.1 million to him, as an individual, in order to keep Sunwest going for a short period of time to allow for an "orderly restructuring." In fact, a motion to allow that use was filed by the Debtor on February 12, 2009, and will be set for a separate hearing.

Page 13 - MEMORANDUM OPINION

For purposes of whether Mr. Harder is entitled to a preliminary injunction, I find that he has not established to date that he has sufficient assets such that he has a reasonable likelihood of a successful reorganization under these facts.

Even if Mr. Harder had not transferred all his interests to Sunwest, I would deny the relief requested based upon the record before me. Victor Marcos of A & M discussed the Restructuring Plan in some detail. However, no evidence was presented as to the value of Mr. Harder's interest in the ALFs now or as restructured. As noted above, the Restructuring Plan relies upon Mr. Harder putting into Sunwest all of the proceeds he is entitled to receive from the January 2009 sale of 45 GE Healthcare ALFs. Such cash infusion from Mr. Harder's bankruptcy estate is far from certain. Moreover, even if that infusion were allowed, it still does not appear that sufficient funds remain to keep the Tier 3 and 4 ALFs operating for the anticipated six month time period to orderly close or sell those facilities. As noted by the court in Cardinal Indus., Inc. v. Buckeye Fed. Sav. & Loan Ass'n., 105 B.R. 834, 848 (Bankr. S.D. Ohio) ("Cardinal I"), supplemented, 109 B.R. 743 (Bankr. S.D. Ohio 1989) ("Cardinal II"), in deciding whether not to grant injunctive relief under § 105, I should focus on " . . . the current value of the Property to the Debtors' reorganization, demonstration of the feasible ability of such Property to generate profits, cash flow or net proceeds which could be available on a reasonable basis for the unsecured creditors of the Debtors, either directly or by substantial reduction in deficiency judgments which would otherwise increase unsecured claims . . ." Cardinal I at 858. In its supplemental decision, the Cardinal Industries court required a specific showing of "the current value of the property to the Debtors' reorganization and a brief explanation of how that valuation was determined; and . . . what is the economic ability of the particular project to generate profits, cash flow or net proceeds . . . ." Cardinal II at 748.

No evidence was presented as to the value of the ALFs to either Mr. Harder or Sunwest. There was little evidence presented as to the ability of the ALFs to generate positive cash flow, indeed only the Tier 1 properties can do so. Furthermore, no evidence was presented showing that if the Restructuring Plan were implemented, how much money might become available to the unsecured creditors of Mr. Harder.

In short, I remain unconvinced that there is a strong likelihood of success on the merits, no

Page 14 - MEMORANDUM OPINION

matter who is holding Mr. Harder's interest in the ALFs and related entities. This is not to say it isn't possible or that there is no chance for a successful reorganization, just that at this stage in Mr. Harder's bankruptcy proceeding, there is insufficient evidence to establish that possibility.

2. Possible irreparable harm to Mr. Harder.

The second element Mr. Harder must establish in order to meet the standards for entitlement to the preliminary injunction that he requests is that there is a possibility he will suffer irreparable harm if the relief is not granted. Mr. Harder contends the irreparable harm he will suffer if the secured lenders are not enjoined from enforcing state law rights against the LLCs would be a failure of his attempted reorganization. He further contends that unless the secured lenders are enjoined from pursuing guarantors, he cannot focus on the reorganization, such that it will fail.

Unfortunately, Mr. Harder's misapprehension of the reorganization with which the court is concerned for purposes of the Motion, results in his failure to meet his burden of establishing this element as well. I reiterate that it is Mr. Harder's personal reorganization in his chapter 11 case that I must consider in ruling on whether to grant a § 105(a) injunction in this case. Sunwest and most of its affiliated entities have not filed for Chapter 11 protection, and they are not the debtors in this case.

Because Mr. Harder's bankruptcy estate will receive no funds from the operation of any of the facilities or from distribution of any equity attributable to him through his member interests in the LLCs, there can be no harm, and therefore no irreparable harm, to his bankruptcy reorganization efforts if secured lenders enforce their rights against collateral in which Mr. Harder has no ownership interest. Further, all actions to collect on guaranties Mr. Harder executed, have been stayed by the commencement of this bankruptcy case. See § 362(a).

Mr. Harder cites In re Continental Airlines for the proposition that irreparable harm can be found if action would "so consume the time, energy, and resources of the debtor that it would substantially hinder the debtor's reorganization effort." Gillman v. Continental Airlines, Inc. (In re Continental Airlines), 177 B.R. 475, 481 n.6 (D. Del. 1993). In re Continental Airlines is distinguishable from the facts of this case. In In re Continental Airlines, certain shareholders of Continental had brought three derivative class

action lawsuits directly against Continental's director and officers. <u>Id.</u> at 477. The Bankruptcy Court enjoined these lawsuits under § 105, and the shareholders appealed, arguing that Continental failed to carry its burden of satisfying the traditional preliminary injunction elements. <u>Id.</u> at 478-79.

In determining whether Continental met the "irreparable harm" element, the Court found that "Continental [was] the real target of the [class action] litigation and that these actions were commenced against parties other than Continental, to the exclusion of Continental itself, in an effort to circumvent the mandatory directives of the automatic stay" <u>Id.</u> at 481. The Court stated that litigating these actions would consume the time, energy, and resources of Continental. <u>Id.</u> But the entire premise for the Court's holding was that Continental was legally obligated to indemnify fully its directors and officers for any judgments against them in connection with the class action litigation. <u>Id.</u> Only because Continental was the real target of the litigation and because that litigation would directly deplete the estate's assets did the Court issue the injunction. <u>See id.</u> at 479, 481-82.

Here, Mr. Harder is no longer CEO of Sunwest. Any actions to enforce trust deeds and notes of the ALFs or any of the SPEs will certainly involve Hamstreet and Sunwest. However, no evidence was presented showing how such lawsuits would consume the time, energy or resources of Mr. Harder, the debtor.

As to the Other Guarantors, any collection action taken against them may or may not impact the proposed Sunwest restructuring, but it will not impact Mr. Harder's bankruptcy. One possible exception might be collection efforts brought against Mrs. Harder on her guaranties, but Mr. Harder offered no evidence of how he might be so distracted if his wife is sued, especially in light of the fact that she is separately represented by counsel, that he could not reorganize his own affairs. Mrs. Harder certainly has the right and the ability to protect her own interests through the filing of her own bankruptcy case.

3. <u>Balancing of harms</u>.

In order to meet the standards for entitlement to the preliminary injunction, Mr. Harder must establish that the balance of hardships is in his favor. I have already discussed Mr. Harder's failure to establish that he will suffer any harm if the secured lenders proceed to enforce their state law rights against

Page 16 - MEMORANDUM OPINION

the LLCs. The secured lenders, however, face significant harm if the injunction is issued.

Mr. Hamstreet testified that the filing of Mr. Harder's bankruptcy case was a strategic decision made for the specific purpose of obtaining an injunction which would "force" the secured lenders to negotiate with the CRO. The secured lenders point out that imposing such an injunction is tantamount to giving Sunwest and the LLCs the benefits of filing their own bankruptcies without the burdens imposed by the Bankruptcy Code.

For instance, the injunction will not provide the secured lenders with any mechanism for obtaining adequate protection. While Mr. Hamstreet testified he would, as the CRO, provide adequate protection where and when he could, he acknowledged that he would not always be able to make full or even partial payments to all secured lenders. He further suggested that a secured lender could file a motion for relief from stay if it did not believe it was adequately protected. I note that if that is true, the stated purpose of obtaining the injunction, i.e, to obtain leverage against the secured lenders, is eviscerated to a large degree.

Further, the net result of issuing an injunction to the secured lenders while preserving their right to seek relief from stay from this court merely increases the use of judicial resources by imposing upon the secured lenders an additional layer of judicial proceedings before beginning enforcement of their rights in state court. This increases the burden and expense to secured lenders in their attempts to enforce those rights, especially as to those secured lenders in the weakest positions, i.e., those whose collateral is a Tier 4 facility which categorically cannot meet its secured debt obligation nor even its operating expenses.

I am also concerned about the very general nature of the pleadings and the evidence presented by Mr. Harder to support his Motion. From the pleadings submitted by the secured lenders, it is clear that they will suffer varying degrees of harm. Further, imposition of a general injunction creates significant ambiguity for other third parties. For instance, some secured lenders have receivers in place. The receivers are operating under existing state court orders. These receivers are not defendants in this adversary proceeding. While the Motion did not address whether the receivers, as agents of the secured lenders, are to be enjoined, or whether the injunction will not apply to the receivers based on their capacity as officers of the

Page 17 - MEMORANDUM OPINION

state courts, Mr. Harder's lawyers orally informed the court at the Hearing that no receivers would be enjoined or removed. The ambiguity in the scope of the injunction as to any secured creditor is a significant harm for the reason that the secured creditor will be required to institute further proceedings in this court to clarify the scope of the injunction.

Most creditors are concerned that extending, in effect, a bankruptcy "stay" to nondebtors will cause them harm because the injunction provides no mechanism which creates the operational and transactional transparency that accompanies a bankruptcy stay.

Weighing the possible harm to Mr. Harder if the injunction does not issue against the potential harm to the secured lenders if an injunction is issued, I find that the balance of harm clearly tips in the favor of the secured lenders. Thus, Mr. Harder has not met his burden on this element.

4. <u>Advancement of public interest</u>.

In order to meet the standards for entitlement to the preliminary injunction, Mr. Harder must show that entry of the injunction would advance the public interest.

<u>Bankruptcy</u>.

Mr. Harder asserts that the "public interest, in the context of a bankruptcy proceeding, is in promoting a successful reorganization." <u>In re Lazarus Burman Assocs.</u>, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993). He stresses that no reorganization for Mr. Harder is possible without the facilities to provide cash and assets for the Restructuring Plan as well as a business to build around. As discussed above, the reorganization with which I am concerned is that of Mr. Harder's, not Sunwest's. Also as discussed above, because Mr. Harder has, at most, ownership interests in numerous LLCs, he has no access to the cash flow of the ALFs. The tangential impact of foreclosure of a facility on his right to receive cash with which to fund a plan for himself becomes yet more remote when Harder's assignment of those ownership interests to the CRO is taken into account.

In my view, the issuance of the preliminary injunction requested by Mr. Harder serves only to damage the public's interest in certainty in the application of bankruptcy law. As pointed out by the secured lenders, the benefits of bankruptcy filed by one person or entity do not normally extend to other legal

1  entities. The creation of substantive rights for legal entities other than a debtor is contrary to the limited

2  authority granted by § 105(a).

3        I am particularly disturbed by Mr. Harder's actions in transferring to the CRO all of his

4  ownership interests in the LLCs immediately before filing this case. Such action serves to preclude Mr.

5  Harder's creditors, as opposed to the creditors of any LLC or of Sunwest, from reaching Mr. Harder's assets.

6  As a matter of public policy I find it untenable to extend special protection to Mr. Harder and his affiliates

7  when he has shown himself unwilling to subject even <u>his</u> assets to the jurisdiction of this court, let alone the

8  assets of any related entity who is to benefit from the special protection offered by the requested preliminary

9  injunction.

10       Harder has not carried his burden to prove that granting the preliminary injunction will

11  advance the public interest in promoting successful reorganization.

12       "Facilitating" Mediation.

13       Mr. Harder asserts that issuance of a preliminary injunction against the secured lenders is

14  consistent with the public policy favoring facilitating mediation as an alternative to litigation. I find this

15  assertion specious. Mr. Harder has initiated <u>litigation</u> against the secured lenders by the filing of this

16  adversary proceeding. While it is true that alternative dispute resolution methods are favored, it does not

17  follow, however, that public policy favors the use of litigation by a bankruptcy debtor to force secured

18  lenders to forego their contractual rights and to accept mediation as their only forum for attempting to

19  enforce their rights.

20       Mr. Harder has not carried his burden to prove that granting the preliminary injunction will

21  advance the public interest of "facilitating" mediation. That being said, in today's economic climate I do not

22  understand the reluctance of the secured lenders to enter into mediation talks with Mr. Hamstreet. Scores of

23  affiliated LLCs already have filed Chapter 11 here in Oregon and Tennessee. Certainly, the secured lenders

24  recognize that if they refuse to negotiate, individual bankruptcies are a very real possibility. Sunwest is now

25  managed by Mr. Hamstreet, not Mr. Harder. Mr. Hamstreet has a well deserved reputation in this

26  community. I previously have entered an order allowing for voluntary mediation. The two federal judges

Page 19 - MEMORANDUM OPINION

1  that have been appointed as mediators, Ninth Circuit Judge Edward Leavy and District Court Judge Michael

2  R. Hogan have settled some of the most contentious litigation in this state and around the country. Judges

3  Leavy and Hogan are available immediately to work on a global settlement of what is a most complicated

4  entanglement of economic relationships. Many secured lenders have already agreed to standstill agreements

5  or to participate in mediation. The TIC Investors have put the secured lenders on notice that the TICs

6  Investors may have claims against those lenders as well as lawyers and other professionals. The TIC

7  Intervenors and those TIC Investors with lawyers who appeared at the Hearing all support a mediation. I

8  most strongly urge the secured lenders to participate in the mediation, or at the very least, have their lawyers

9  meet with Judges Leavy and Hogan as a first step.

10                    Protection of Residents.

11            Mr. Harder asserts that the public's interest in protecting seniors will be served by issuance of

12  the preliminary injunction. He contends that the changes in personnel and routines attendant with any

13  change in management likely to occur if a receiver is in place are "likely to be disruptive and discomforting

14  to the senior residents." While undoubtedly true that change in any routine can be discomforting to senior

15  residents of facilities, often to an extreme degree, the evidence in the record suggests there are other more

16  important considerations in the protection of seniors than discomfort. The reports of the State of Washington

17  in the receivership proceeding with respect to the Englewood Heights facility suggest that seniors would be

18  better protected by management other than Sunwest. Similarly, the receiver appointed with respect to the

19  Town Village facility in Oklahoma City noted "alarming deficiencies," including outstanding citations for a

20  roof with a hole and inadequate drainage, as well as several fire and safety issues at the facility. Eugene

21  Grace testified that he currently is the receiver for three Sunwest facilities, and that Sunwest's food budget

22  per resident per day at those facilities had been approximately $2.75, an amount less than one-half the budget

23  he typically sees in similar facilities.

24            No evidence was presented which demonstrated that the residents of those facilities where

25  receivers had been put in place were harmed. To the contrary, the evidence was that the receivers had a

26  calming affect on the residents.

Page 20 - MEMORANDUM OPINION

While the Tier 1, Tier 2 and Tier 3 facilities generate sufficient revenue to meet operating expenses, only the Tier 1 facilities generate sufficient revenue to meet all of their monthly obligations. No evidence was presented with respect to capital reserves of the Tier 1 facilities from which maintenance obligations could be met if the need arose.

Mr. Harder argues that Sunwest's inability to use excess revenue from Tier 1 facilities to assist other Tier facilities meet their monthly obligations, puts senior residents, particularly those at Tier 4 facilities, at risk. However, Mr. Harder has not established Sunwest's right to take revenues from Tier 1 facilities and transfer those revenues to other facilities in the first place. Indeed, many secured lenders' documents would forbid that.

Finally, to the extent receivers are appointed and foreclosure actions are commenced, all under the supervision of the state courts, I am not willing to concede that the laws of the state in which a particular facility exists do not provide sufficient protection for the rights of senior residents of that facility.

Mr. Harder has not carried his burden to prove that granting the preliminary injunction will advance the public interest of protecting senior residents of the facilities.

C. <u>Other Bases for Denying the Motion</u>.

Rule 20(a)(2) of the Federal Rules of Civil Procedure, applicable in this adversary proceeding pursuant to Fed. R. Bankr. P. 7020, provides:

> "Persons . . . may be joined in one action as defendants if:
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) any question of law or fact common to all defendants will arise in the action."

"[FRCP] 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense. <u>Guedry v. Marino</u>, 164 F.R.D. 181, 185 (E.D.La. 1995). Although there is some argument in theory that trial efficiency was promoted by allowing Mr. Harder to bring a single adversary proceeding against 99 secured lenders, in the end the joinder was inappropriate. The relief requested against the individual defendants did not arise out of the same transactions, nor were there common questions of law or fact as to all defendants.

Page 21 - MEMORANDUM OPINION

The request for injunctive relief against each secured lender raises different issues, and must be viewed in a separate and individual light by the Court. The claim against each secured lender arises from that lender's loans to affiliates of Mr. Harder. Each loan was made with different collateral, a different rate of interest, and different elements of default. Moreover, the secured lenders themselves are situated differently depending, among other things, on whether their particular collateral is a Tier 1 ALF or another tier, whether a default has been declared, whether foreclosure was begun prepetition, and whether a receiver has been appointed. Mr. Harder did not provide any evidence at the Hearing of the irreparable harm he might suffer if a specific defendant were not subject to an injunction, which was also relevant to balancing the hardships between Mr. Harder and any specific defendant against which an injunction might be ordered. In this instance, the improper joinder of all the defendants results in a failure by Mr. Harder to prove his entitlement to an injunction as to any defendant. Put simply, the relief requested in the Motion was overbroad.

CONCLUSION

Mr. Harder chose to conduct his business and investment affairs through hundreds of LLCs. Each LLC is a separate legal entity under state law and for purposes the Bankruptcy Code. The property owned by the LLCs is not property of Mr. Harder's bankruptcy estate. Mr. Harder asserts that the restructuring of Sunwest and the various LLCs are in effect a restructuring of his personal interests in his global business affairs. Yet on the eve of his own bankruptcy petition he transferred away all of his interests in the entities which comprise what he contends is his "business." While I understand the appeal of bringing all the LLCs under the protection of this court and understand the hardship this ruling may cause the TIC Investors and the individual SPEs, I must nevertheless follow the Bankruptcy Code.

Mr. Harder has not carried his burden to establish that he is entitled to the entry of injunctive relief against the defendants.

Mr. Stone should submit an order consistent with this opinion within 10 days.

###

cc:   Stephen F. English
      Albert N. Kennedy

Page 22 - MEMORANDUM OPINION

1    Gary K. Kahn
     Richard J. Stone
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 23 - MEMORANDUM OPINION